IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JESSIE JAMES NELSON,
    Petitioner,

vs.                                                  Case No.: 3:05cv137/RS/EMT

JAMES R. McDONOUGH,
    Respondent.
_____/

**REPORT AND RECOMMENDATION**

       This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 16). Respondent filed an answer and relevant portions of the state court record (Doc. 29). Petitioner filed a reply (*see* Doc. 33).

       The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.       BACKGROUND AND PROCEDURAL HISTORY

       The procedural background of this case is undisputed by the parties and established by the state court record. Following a jury trial in the Circuit Court for Escambia County, Florida, in May of 2000, Petitioner was convicted of first degree murder (Doc. 29, Ex. B at 521). He was sentenced on May 3, 2000, to life imprisonment with 387 days of pre-sentence jail time credit (*id.*, Ex. A at 14–18). Petitioner appealed his conviction and sentence to the Florida First District Court of Appeal (First DCA) (*id.*, Ex. C). Petitioner's appellate counsel filed a brief asserting that counsel was unable to make a good faith argument that reversible error occurred in the trial court, in accordance

with Anders v. California, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967) (*see id.*, Answer Brief of Appellee at 1–6). The appellate court affirmed the conviction and sentence per curiam without opinion on June 20, 2001, with the mandate issuing July 6, 2001 (Doc. 29, Ex. D at 33, 34). Nelson v. State, 789 So. 2d 992 (Fla. 1st DCA June 20, 2001) (Table).

On May 5, 2002, Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 29, Ex. E at 35–56, 64–91). Following an evidentiary hearing, the trial court denied the motion on September 15, 2003 (*id.*, Ex. F at 183–91, Ex. G). Petitioner appealed the decision to the First DCA (*see id.*, Ex. H), and the appellate court affirmed the decision per curiam without written opinion on February 23, 2005, with the mandate issuing March 22, 2005 (Doc. 29 at 3). Nelson v. State, 895 So. 2d 1070 (Fla. 1st DCA Feb. 23, 2005) (Table).

Petitioner filed the instant habeas action on April 14, 2005 (*see* Doc. 1 at 26). Respondent concedes that the petition was timely filed (Doc. 29 at 3–4).

II.   STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254 now provides:

>   (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>     (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>     (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1] The appropriate test in habeas cases was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding. *See* Wellington v. Moore, 314 F.3d 1256, 1260–61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343–45 (11th Cir. 2002). First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication. Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343. Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law. Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344. "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the

---

[1] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99, 120 S. Ct. at 1499–1503, 1511–16); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13, 120 S. Ct. at 1518–23). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

relevant Supreme Court precedent." Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11thCir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 405)). "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404–06). If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority." Fugate, 261 F.3d at 1216. Likewise, if the facts of the Supreme Court cases and the petitioner's case are not substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." *Id.* (citing and quoting Williams, 529 U.S. at 406). A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 410. The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Bell v. Cone, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting Williams, 529 U.S. at 411). Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003). A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by

a federal court produces a firm conviction that [the state court] judgment is infected by constitutional error." Williams, 529 U.S. at 389. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted). Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent. Van Poyck v. Fla. Dep't of Corrections, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); *see* Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).") (dictum); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835–36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); *see also* Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations). Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. *See* Callahan v. Campbell, 427 F.3d 897, 926 (11th Cir. 2005) (citing § 2254(e)(1); Rutherford v. Crosby, 385 F.3d 1300, 1308 (11th Cir. 2004) ("[Petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record.")).

Within this framework, the court will review Petitioner's claims.

III.   PETITIONER'S CLAIMS

A.   Ground One: State court fact-finding was contrary to clearly established federal law in determination of Petitioner's claim of ineffective assistance of counsel for counsel's concession of Petitioner's guilt at trial [Restated].

(Doc. 16 at 4). Petitioner claims that his trial counsel provided ineffective assistance by conceding his guilt without his consent at four times during trial: (1) during her opening statement, defense counsel stated, "And I submit that the evidence will show that it does suggest that there was more than one gun used in this attempted robbery; (2) during cross-examination of co-defendant Christopher Kye, defense counsel asked, "But you knew at the time that there was a possibility that the victim was dead because of the actions that the three of you took?"; (3) during closing arguments, defense counsel stated, "Then why did Mr. Rimmer make a deal for Mr. Kye to plead to a maximum of 15 years in the state prison if he is just as guilty as everybody else?"; and (4) during closing arguments, defense counsel stated, "Then you move down to what I consider should be the correct verdict in this case. No more than manslaughter, but I submit to you the correct verdict would be not guilty." (Doc. 16 at 4–8). Petitioner contends that the state court's determination that none of these statements constituted concessions of guilt was contrary to Supreme Court law and based upon an unreasonable determination of the facts (*id*.; Doc. 16, attached supporting memorandum at 5). Furthermore, the state court's application of the prejudice standard articulated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) was contrary to Supreme Court law because this was a case in which the presumption of prejudice set forth in United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) applied (Doc. 16 at 5).

The undersigned will first address whether Strickland or Cronic is the clearly established Supreme Court law applicable to Petitioner's claim. In Strickland, which was decided the same day as Cronic, the Supreme Court announced a two-part test for evaluating claims that a defendant's counsel performed so deficiently in her representation of the defendant that the conviction should be reversed. 466 U.S. at 687–88. To obtain relief under Strickland, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*

In Cronic, the Court identified three situations that involved circumstances that so likely prejudiced the defendant that he was not required to prove prejudice upon demonstrating that his

attorney's performance was deficient; instead, prejudice would be presumed: (1) where the defendant is denied the presence of counsel at a "critical stage" in the proceedings, or the defendant has actually or constructively been denied counsel at a "critical stage" by government action, (2) where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," and (3) where counsel is called upon to render assistance under circumstances where competent counsel very likely could not. 466 U.S. at 658–59 and n.25.

After Cronic, the Supreme Court emphasized that the presumption of prejudice based upon counsel's failure to meaningfully test the State's case applies only when counsel's failure is "complete." Bell v. Cone, 535 U.S. 685, 697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) ("We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.'") (quoting Cronic, 466 U.S. at 659). In Bell, the Supreme Court held that Cronic did not apply to a defendant's claim that defense counsel failed to oppose the prosecution at specific points in the proceeding, but only to a claim that counsel failed to do so throughout the proceeding as a whole. 535 U.S. at 697.

In the instant case, Petitioner argues not that his counsel failed to oppose the prosecution throughout the trial as a whole, but that his counsel failed to do so at four specific points, when counsel allegedly conceded Petitioner's guilt once during her opening statement, once during her cross-examination of a State witness, and twice during closing arguments. Because Petitioner's claim is of the same kind as the habeas petitioner in Bell v. Cone, the applicable Supreme Court standard is Strickland. *See* Atwater v. Crosby, 451 F.3d 799, 808 (11th Cir. 2006), *cert. denied*, --- U.S. ---, 2007 WL 36551 (U.S. Jan. 8, 2007) (applying Strickland to claim that counsel was constitutionally ineffective for stating that evidence supported conviction for second degree murder during closing argument of first degree murder trial).

    1.  Clearly Established Supreme Court Law

As discussed *supra*, to obtain relief under Strickland, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that

he suffered prejudice as a result thereof. *Id.* at 687. If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf.* Engle v. Isaac, 456 U.S. 107, 133-134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed.2 d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See* Michel v. Louisiana, *supra*, 350 U.S. at 101, 76 S.Ct. at 164.

Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Strickland, 466 U.S. at 693. However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–406.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether

there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

### 2. Federal Review of State Court Decision

Petitioner presented this ineffective assistance of counsel claim in his Rule 3.850 motion (Doc. 29, Ex. E at 47–50). The state court denied Petitioner's claim on the ground that the comments identified by Petitioner did not constitute concessions of guilt (*id.*, Ex. F at 188). The court additionally noted that even if the fourth comment identified by Petitioner constituted a concession of guilt, Petitioner failed to show how the outcome of his trial would reasonably have changed if counsel had not made this statement (*id.*).

The state court analyzed Petitioner's claim under a two-pronged standard: whether counsel did, in fact, concede Petitioner's guilt and, if so, whether Petitioner suffered any prejudice as a result, specifically, whether the outcome of his trial would reasonably have changed if counsel had not made the statements (Doc. 29, Ex. F at 185–88). Although the state court did not cite Strickland, neither the reasoning nor the result of the state court decision contradicts it; therefore, Petitioner has failed to satisfy the "contrary to" clause of section 2254. *See* Early v. Packer, 537 U.S. at 8. Therefore, only remaining question is whether the state court decision was objectively unreasonable.

To determine whether defense counsel performed deficiently by making the four comments identified by Petitioner, the statements must be reviewed in their context and in the context of the defense strategy. At the evidentiary hearing on Petitioner's Rule 3.850 motion, defense counsel

described her trial strategy as the following: although Petitioner knew there was going to be a drug buy and that a robbery had been discussed, he was not involved in planning the robbery or planning the shooting; he was unaware that a robbery or shooting was actually going to occur; he was not present when the robbery or shooting occurred; and he should be found not guilty on that basis (Doc. 29, Ex. G at 133–35). Counsel stated she discussed this strategy with Petitioner, as well as the fact that his actions could lead to a conviction for manslaughter (*id.* at 135, 137).

This defense strategy is reflected in defense counsel's opening statement at trial. She told the jury that the victim, Klie Faulkner, was a well-known drug dealer in the community, and that Christopher Kye, Joey Harper, and Petitioner were all charged with first-degree murder for the killing of Mr. Faulkner (Doc. 29, Ex. B at 148). Counsel told the jury that Mr. Kye entered an agreement with the State that he would plead guilty to manslaughter and receive a maximum sentence of 15 years, and Mr. Harper's trial had already occurred (*id.* at 148–49).[2] She stated that the evidence would show that the victim was good friends with Joey Harper and sold drugs to him, and Joey Harper in turn gave the drugs to friends and sold them (*id.* at 152). She stated that Petitioner was a friend of Joey Harper and was acquainted with Christopher Kye, but neither Petitioner nor Christopher Kye knew the victim (*id.* at 153). Counsel told the jury that Joey Harper had a girlfriend whose sister was Christopher Kye's girlfriend, and the four of them planned that Harper and Kye would visit the girls at their parents' home in Georgia the weekend that the shooting occurred (*id.* at 153–54). Joey Harper planned to purchase drugs from Klie Faulkner prior to leaving for Georgia so they could bring them on the trip (*id.* at 154). Petitioner and his girlfriend planned to go with Harper and Kye to Georgia (*id.* at 155).

Defense counsel stated that the night before the shooting, Joey Harper was at his other girlfriend's house, and Petitioner went there to smoke marijuana (*id.* at 156). Counsel stated that it was alleged that Petitioner showed a pistol that he had under his shirt, and that there was a discussion about robbing Klie Faulkner of drugs (*id.* at 157). Counsel stated that there may be evidence that Harper owed money to Faulkner, and that the robbery plan was hatched through Harper for this reason (*id.*). Counsel stated that she believed the jury would hear from Joey Harper

---

[2]Mr. Harper was convicted of manslaughter in a separate trial (Doc. 29 at 8).

that he was hesitant to rob Faulkner because he did not want to lose his drug connection (*id.* at 157–58).

The next day, Joey Harper went to where Petitioner was living and saw a gun laying around, so he suggested that they go target practicing (*id.* at 159). The two went to a pawn shop, and Harper purchased two boxes of .22 Winchester ammunition (*id.*). Harper later told law enforcement that he and Petitioner shot guns (*id.*). Counsel also told the jury that they would probably hear testimony of an employee of the Florida Department of Law Enforcement, who testified at Harper's trial that the bullet recovered from Faulkner's body was a Remmington bullet (*id.* at 159–60). Counsel stated that during various times during that day, Harper talked to Kye about committing the robbery, and that Petitioner was not involved in those conversations (*id.* at 160). Counsel stated that Kye initially discouraged the robbery, but then agreed to it (*id.*). Counsel additionally stated that although Kye tried to minimize his involvement in the events, the evidence would show that he not only knew what was going on, he offered advice regarding how to accomplish it (*id.*). Counsel told the jury that Harper talked to Petitioner about buying drugs from Faulkner versus robbing him, and they talked about how to do it and that there would be a gun or guns brought along to scare Faulkner, but there was no discussion of shooting anyone (*id.* at 160–61). Counsel stated that later that day, Harper, Kye, Petitioner, and Petitioner's girlfriend got together, and Joey Harper formulated the following plan: Harper would drive alone in his car to Bennigan's Restaurant to meet Faulkner to buy drugs; Petitioner's girlfriend would drop off Petitioner and Kye at Bennigan's; and only Harper would actually go inside the restaurant (*id.* at 161–62).

Counsel stated that the evidence would show that Harper went into the restaurant and bought drugs from Faulkner (*id.* at 162). Counsel told the jury that Kye and Petitioner were outside the restaurant, and that a witness, Jennifer Jernigan, would testify that she saw Petitioner alone near a neighboring restaurant (*id.* at 162–63). Ms. Jernigan would further testify that Petitioner told her they were going to buy drugs that night, and he would call her later (*id.* at 163). Counsel stated she believed that Ms. Jernigan would testify that she never saw Christopher Kye, but that Kye would testify that he and Petitioner were never separated when they were outside Bennigan's (*id.*). Counsel further stated that Ms. Jernigan would testify that she then saw Petitioner get into a car; therefore, the evidence would show that Petitioner could not have shot Faulkner because he was

elsewhere talking to Ms. Jernigan (*id.*). Counsel stated that the evidence would show that Harper lured Faulkner out of Bennigan's to be robbed, and that it was questionable whether one or two guns were involved (*id.* at 164).

Counsel told the jury that Christopher Kye, who had made a deal with the State that he would not be convicted of more than manslaughter and receive a 15 year sentence, had already testified against Harper and was expected to testify against Petitioner (*id.*). Counsel told the jury that they would hear from Christopher Kye and Joey Harper that Petitioner fired the gun that killed Faulkner but their testimony was debatable (*id.* at 165). Counsel told the jury that they would hear evidence that Harper disposed of ammunition and pieces of the box or boxes that the ammunition came in, and that he also hid his car (*id.*). Counsel stated that Kye, Harper, Petitioner, and Petitioner's girlfriend went to Georgia, but Petitioner and his girlfriend were left at a motel by Harper and Kye while the two of them went to their girlfriends' house, thus giving the two of them time to create a story about how Faulkner was killed (*id.* at 165–67). Counsel further stated that Kye's brother is a law enforcement officer, and Harper and Kye brokered a deal whereby Harper would turn himself in and minimize Kye's involvement (*id.* at 167–69).

Counsel told the jury that they would probably hear testimony from James Mullen, who was known as a jailhouse snitch, meaning, that he "ratted" someone out to help himself (*id.* at 170–71). Counsel stated that the evidence would show that Mullen was serving a sentence for a felony and was in the local jail awaiting a hearing on his request for a reduction of his sentence (*id.* at 171). Mullen told a security officer that he wanted to speak with the person in charge of investigating Petitioner's case because he had some information about it (*id.*). Counsel stated that while in jail, Petitioner shared with Mullen the depositions of everyone who had been deposed in the case, including Joey Harper and Christopher Key (*id.* at 172). Counsel told the jury that they should not give credence to Mullen's testimony because everything he would testify to could have been gleaned from the deposition transcripts (*id.* at 172). Additionally, some of Mullen's statements were too outrageous for belief, and even Harper and Kye would contradict Mullen's testimony (*id.* at 172–74).

Counsel stated that Kye and Harper would testify that they saw Petitioner throw a gun off a bridge on their way to Georgia, and counsel continued:

> So, if one gun has been thrown into the Blackwater River, and there's talk of another gun or a gun being stashed somewhere in Georgia and a car being wiped down somewhere in Georgia, does that suggest—and I submit that the evidence will show that it does suggest—that there was more than one gun used in this attempted robbery.

(*id.* at 173–74). Counsel then read letters exchanged between Mr. Mullen and the prosecutor in which Mullen asked the prosecutor to reduce his sentence by six months, and the prosecutor responded that he could not discuss Mullen's request until after Petitioner's trial (*id.* at 174–76). Defense counsel concluded:

> And I submit to you that once you hear all of the evidence and the instructions that Judge Parnham will give you, and that if you follow the law, that you will find that Jessie Nelson is not guilty of the crime with which he's charged, which is first degree murder.

(*id.* at 176).

Petitioner's first claim is that counsel's statement, "and I submit that the evidence will show that it does suggest—that there was more than one gun used in this attempted robbery" was a concession of his guilt because it relieved the State of its burden to prove that there was an attempted robbery, which was an element of felony murder (Doc. 16 at 8). Petitioner additionally contends that counsel's stating that two guns were used in the attempted robbery led the jury to presume that he possessed one of the guns (*id.*).

The state court found that defense counsel's statement did not constitute a concession of Petitioner's guilt (Doc. 29, Ex. F at 186). The trial court found that counsel merely acknowledged that there was an attempted robbery, a fact that was undisputed (*id.*). The court found that the statement in no way conceded that Petitioner knew of or participated in the attempted robbery, and that counsel maintained throughout the trial that Petitioner knew nothing of the plan to rob the victim (*id.*).

The state court's factual determination that defense counsel did not admit guilt and did not in any way concede that Petitioner knew of or participated in the attempted robbery is presumed correct unless Petitioner rebuts the finding with clear and convincing evidence. *See* Messer v. State of Fla., 834 F.2d 890, 896 (1987) (that counsel did not admit guilt, but rather made tactical decision not to make closing statement was finding of fact); 28 U.S.C. § 2254(e)(1). Petitioner has failed to

present clear and convincing evidence to rebut the state court's factual determination.  Furthermore, the state court's finding that counsel's statement did not constitute a concession of guilt is amply supported by the record.  The trial transcript shows that counsel recited what she expected the evidence would show, including that Joey Harper had a gun, but counsel did not admit that Petitioner planned or participated in either the attempted robbery or the shooting.  Indeed, throughout her opening statement, counsel maintained that Petitioner was not involved in the planning of the robbery, nor did he participate in the robbery or the shooting, and she concluded her opening statement by stating that if the jury followed the law, they would find Petitioner not guilty of first degree murder.  Therefore, Petitioner failed to show that the state court decision was based upon an unreasonable determination of the facts.  Additionally, because Petitioner's claim that counsel's statement conceded his guilt fails as a factual matter, he cannot establish deficient performance by counsel in this regard.

The next statement which Petitioner argues was a concession of guilt occurred during defense counsel's cross-examination of Christopher Kye, when counsel stated, "But you knew at the time that there was a possibility that the victim was dead because of the actions that the three of you took?" (*see* Doc. 16 at 6–7).  The state court found as fact that counsel's statement was not a concession of Petitioner's guilt, but that counsel was impeaching Mr. Kye's previous testimony that it was Petitioner's initial idea to rob Mr. Faulkner, that Petitioner planned the actual robbery, and that he (Kye) refused to participate in the robbery (Doc. 29, Ex. F at 186–87).

Petitioner has failed to present clear and convincing evidence to rebut the state court's factual determination that defense counsel's statement was not a concession of Petitioner's guilt.  Furthermore, the state court's finding is well supported by the record.  The trial transcript shows that Christopher Kye testified that on the evening of the shooting, he went to Joey Harper's house and Petitioner subsequently arrived (Doc. 29, Ex. B at 251–52).  He testified that Petitioner suggested that they rob Klie Faulkner of drugs (*id.* at 252).  He said he heard Petitioner and Harper discussing a plan to commit the robbery; they initially discussed a scenario of Harper and Faulkner in a car and Petitioner "scaring—walking up and putting the gun on Klie" (*id.* at 253).  Kye testified that he was asked to participate in the robbery, but he refused (*id.*).  Kye then testified that his understanding of the robbery plan was that Harper and Faulkner would get in the car, and he and Petitioner would

get in the car; Kye was supposed to hold Faulkner down; Petitioner would pull the gun on Faulkner; and Kye and Petitioner would take the drugs and act like they, too, were robbing Harper (*id.* at 255). Kye testified that when he and Petitioner arrived at Bennigan's, in a separate car from Harper's, Kye told Petitioner that he did not want to participate in the robbery, but Petitioner responded that they were going to "hit" Faulkner (*id.* at 256). Kye testified that he and Petitioner waited for Harper and Faulkner to get into Harper's car, and then Petitioner began walking toward the car, but he (Kye) did not follow (*id.* at 258). Kye stated that Petitioner turned around and said, "Come on," but Kye still did not follow (*id.*). Petitioner then started waving the gun and said, "Come on," and Kye followed (*id.* at 258–59). Kye testified that he and Petitioner got into the car and he grabbed Faulkner, but then let him go because ". . . I didn't want to grab him in the first place." (*id.* at 259). Kye testified that when Faulkner attempted to get out of the car, Petitioner said, "I'm about to shoot this bitch" and shot him (*id.* at 260).

Defense counsel's strategy to impeach Kye's testimony during cross-examination included the following: (1) emphasizing that Kye was testifying pursuant to an agreement with the State whereby he would receive a lesser conviction and sentence than what Petitioner was facing, (2) showing that Kye was minimizing his role in the planning and commission of the robbery, (3) pointing out inconsistencies in Kye's testimony and his prior statements and testimony, and (4) showing that after Kye learned of Faulkner's death, he and Harper delayed in returning from Georgia and devised a plan to use Kye's connection with law enforcement to minimize Kye's criminal liability (*id*. at 278–313). Counsel's question, "But you knew at the time that there was a possibility that the victim was dead because of the actions that the three of you took?" came after she elicited admissions from Kye that his actions during the shooting were part of the plan, thus his testimony minimizing his role was untrue, and in the context of counsel's attempt to elicit an admission from Kye that he delayed returning from Georgia until he and Harper could get their stories straight (*id.* at 282–83, 298–300, 412–24). Counsel was attempting to impeach Kye in the context of his own version of the facts. The state court record fully supports the state court's factual determination that counsel's statement was not a concession of Petitioner's guilt, but impeachment of Kye's testimony. Therefore, Petitioner failed to show that the state court decision was based upon an unreasonable determination of the facts. Additionally, because Petitioner's claim that counsel's

statement conceded his guilt was factually unsupported, the state court correctly concluded that Petitioner's ineffective assistance of counsel claim was without merit.

The remaining two comments of defense counsel which Petitioner characterizes as concessions of his guilt were made during closing argument. Petitioner alleges that counsel stated, "Then why did Mr. Rimmer make a deal for Mr. Kye to plead to a maximum of 15 years in the state prison if he is just as guilty as everybody else?" (Doc. 16 at 7). The state court found that counsel's exact statement was, "Why did [the State] make a deal for Mr. Kye to plead to a maximum of 15 years in state prison if he is just as guilty as everyone else, which is what [the State] told you.", and that counsel followed her statement with the comment, "Is there a law enforcement connection?" (Doc. 29, Ex. F at 187). The state court also found that defense counsel made the comments after the prosecutor stated that all three co-defendants were guilty of first degree murder, in spite of the fact that Mr. Kye had been offered a plea agreement of no more than 15 years (*id.* at 187 and nn. 5, 6, 7). The state court found that defense counsel's comments were a reference to the fact that Mr. Kye's brother was a law enforcement officer, that Mr. Kye called his brother immediately after he learned that someone had been killed at Bennigan's, and that defense counsel had impeached Kye by suggesting that he tried to garner favor with law enforcement by involving his brother (*id.* at 187). Based upon these facts, the state court found that counsel's comments did not constitute a concession of Petitioner's guilt (*id.*).

Petitioner has failed to present clear and convincing evidence to rebut the state court's factual determination that defense counsel's statement was not a concession of Petitioner's guilt. Furthermore, the state court's findings are supported by the record. Counsel's comment was a recitation of the prosecutor's statement that all three of the men were guilty of first-degree murder (*see* Doc. 29, Ex. B at 448, 460) and a suggestion that Kye was benefitting from his testimony against Petitioner and his connection with law enforcement. Thus, the state court decision was not based upon an unreasonable determination of the facts. Furthermore, because Petitioner failed to establish that counsel's comment was a concession of guilt, he did not demonstrate that counsel's performance was deficient.

The last comment which Petitioner characterizes as a concession of guilt is defense counsel's statement, "Then you move down to what I consider should be the correct verdict in this case. No

more than manslaughter, but I submit to you the correct verdict would be not guilty" (Doc. at 16 at 5, 7). The state court found as fact that the statement was not a concession of Petitioner's guilt, but a designation of what defense counsel believed was the upper limit of what the jury could conceivably find, and that counsel clearly stated her position that the proper verdict was not guilty (Doc. 29, Ex. F at 188).

The state court record amply supports the state court's determination that defense counsel's comment was not a concession of guilt. Throughout her closing argument, defense counsel vigorously argued that two main witnesses, Christopher Kye and James Mullen, were liars and that their testimony was motivated by self-benefit, and that the evidence was insufficient to find Petitioner guilty (Doc. 29, Ex. B at 458-64). Counsel argued:

> The judge is going to give you an instruction as to what constitutes first-degree murder. He is also going to give you an instruction on what constitutes second-degree murder. He is also going to give you an instruction on what constitutes manslaughter. Those instructions are going to be lengthy.
>
> For example, if you find that there is not enough evidence for a conviction on first-degree murder, then you go down, you consider whether or not there is enough evidence to convict a person of second-degree murder. If you find that there is not enough evidence to prove that, you go down even further, you look at manslaughter. . . .
> If you look at that and you say we don't find that either, then you move down to what I consider what should be the correct verdict in this case. No more than manslaughter, but I submit to you the correct verdict would be not guilty.

(*id.* at 469–70). Counsel clearly stated that the correct verdict in the case was not guilty; therefore, her comment did not constitute a concession of Petitioner's guilt. Because the state court reasonably determined that Petitioner's ineffective assistance claim was factually unsupported, the denial of his claim was not contrary to or an unreasonable application of Strickland.

Finally, Petitioner argues two points in his supporting memorandum that merit individual attention. First, he asserts that defense counsel admitted during the post-conviction evidentiary hearing that she conceded his guilt, thus establishing the concessions as fact (*see* Doc. 16, attached supporting memorandum 5). Petitioner mischaracterizes counsel's comments. Counsel admitted that she "misspoke" when she stated during her opening statement that Joey Harper and Petitioner talked about robbing Faulkner and agreed that a gun would be brought to scare him, because she

intended to say Christopher Kye and Harper had that discussion (*see* Doc. 29, Ex. G at 148–50). Counsel also admitted that she made the statements which Petitioner characterizes as concessions of his guilt, but she did not admit that the statements were concessions of guilt (*id*. at 148–61). Furthermore, counsel's hindsight admissions of errors in her trial performance in no way bound the state court, nor do they bind this court, to conclude that her performance was constitutionally deficient.

Second, Petitioner's argument that defense counsel's comments were analogous to entry of a guilty plea without his consent is meritless. In support of his argument, Petitioner cites Nixon v. Singletary, 758 So. 2d 618 (Fla. 2000) and Nixon v. State, 857 So. 2d 172 (Fla. 2003); however, those cases were reversed by the Supreme Court in Florida v. Nixon, 543 U.S. 175, 187, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). In Nixon, a capital case, the defendant's counsel actually conceded the defendant's guilt during opening and closing statements. 543 U.S. at 182–83 (in his opening statement, defense counsel stated, "In this case, there won't be any question, none whatsoever, that my client, Joe Elton Nixon, caused Jeannie Bickner's death . . . [T]hat fact will be proved to your satisfaction beyond any doubt."). During the prosecution's case in chief, defense counsel cross-examined witnesses only when he believed that their statements needed clarification, and he did not present a defense case. *Id.* at 183. Defense counsel objected to the introduction of some crime scene photographs and contested some of the jury instructions. *Id.* The Florida Supreme Court deemed defense counsel's statements to the jury "the functional equivalent of a guilty plea," and held that counsel was required to obtain the defendant's consent to a concession trial strategy. *Id.* at 188.

Upon review of the state supreme court's decision, the United States Supreme Court held that defense counsel's concession of guilt was not the equivalent of a guilty plea because the defendant retained the rights accorded a defendant in a criminal trial—the State was required to present competent, admissible evidence establishing the essential elements of the crime with which the defendant was charged; the defense reserved the right to cross-examine witnesses for the prosecution, to seek exclusion of evidence, and to contest jury instructions, and the defendant's right to appeal was not hindered by the concession. *Id.* at 188–89. Additionally, the Court held that although an attorney undoubtedly has a duty to consult with the client regarding "important decisions, including questions of overarching defense strategy," defense counsel's failure to obtain

the defendant's express consent to a strategy of conceding guilt during the guilt phase of his capital case did not automatically render counsel's performance deficient. *Id.*, 543 U.S. at 187, 190–91 (internal quotations and citations omitted).

In the instant case, defense counsel did not concede Petitioner's guilt to first degree murder, nor did her statements constitute entry of a guilty plea. The State was required to present competent, admissible evidence establishing the essential elements of first degree murder; defense counsel vigorously cross-examined the State's witnesses and presented witnesses on behalf of the defense; defense counsel made strategic motions before and during trial, including a motion for judgment of acquittal; counsel made meaningful objections to the admissibility of testimony; and she presented a cogent defense theory in her opening and closing statements. In light of the vigorous defense mounted by Petitioner's counsel, it is completely unreasonable to liken her four statements taken out of context to entry of a guilty plea. Therefore, Petitioner's argument that counsel performed in a constitutionally ineffective manner by making those four statements without his consent is wholly without merit.

In sum, Petitioner has failed to demonstrate that the state court decision was unreasonable or contrary to Strickland; therefore, he is not entitled to federal habeas relief.

B.   Ground Two:  Ineffective assistance of counsel for failure to examine potential jurors for determination of any actual bias towards Petitioner.

(Doc. 1 at 4). Petitioner asserts that during voir dire, the trial judge asked potential jurors to raise their hands if they had ever been victims of a crime, and counsel permitted five persons who raised their hands, namely, Paige, Sanders, Hunter, Boyd, and Blake, to serve on Petitioner's jury without adequately questioning each of them to discover if they had any bias against Petitioner (*id.* at 4, 9). Petitioner alleges that he was prejudiced by counsel's error because the jurors were possibly biased (*id.* at 10).

1.   Clearly Established Supreme Court Law

As discussed *supra*, the Supreme Court standard for evaluating claims of ineffective assistance of counsel is Strickland.

2.	Federal Review of State Court Decision

In the written opinion denying Petitioner's claim, the state court found as fact that Petitioner participated in the selection of his jury, and after the jury was selected, he stated he was satisfied with the jury that was chosen (Doc. 29, Ex. F at 189). Based upon these findings, the state court concluded that Petitioner was "estopped" from raising any claims regarding the selection of his jury (*id.*).

It does not appear that the state court applied Strickland to Petitioner's claim; therefore, de novo review in this court is appropriate. Petitioner does not allege, nor does the record contain any evidence to show, that any of the five jurors identified by Petitioner were actually biased against him. Therefore, Petitioner has failed to demonstrate a reasonable probability that the composition of the jury would have been different if counsel had further questioned the five jurors about their being victims of crime. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

Based upon the foregoing, it is respectfully **RECOMMENDED**:

That the amended petition for writ of habeas corpus (Doc. 16) be **DENIED**.

At Pensacola, Florida, this 29th day of January 2007.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**